**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 24-1080

ROHAN DHRUVA; JOSHUA STERN,

　　　　　　Plaintiffs – Appellees,

v.

CURIOSITYSTREAM, INC.,

　　　　　　Defendant – Appellant.

On Appeal from the United States District Court for the District of Maryland, at Baltimore. Stephanie A. Gallagher, District Judge. (1:23-cv-02265-SAG)

Argued: November 1, 2024　　　　　　　　　　　　Decided: March 10, 2025

Before WILKINSON, QUATTLEBAUM, and HEYTENS, Circuit Judges.

Reversed and remanded by published opinion. Judge Heytens wrote the opinion, which Judge Quattlebaum joined. Judge Wilkinson wrote a dissenting opinion.

**ARGUED:** Adam Bowser, ARENTFOX SCHIFF LLP, Washington, D.C., for Appellant. Stefan Bogdanovich, BURSOR & FISHER, P.A., Walnut Creek, California, for Appellees. **ON BRIEF:** Karen Ellis Carr, Tierra S. Jones, ARENTFOX SCHIFF LLP, Washington, D.C., for Appellant. L. Timothy Fisher, Neal J. Deckant, BURSOR & FISHER, P.A., Walnut Creek, California; William N. Sinclair, SILVERMAN THOMPSON SLUTKIN & WHITE, LLC, Baltimore, Maryland, for Appellees.

TOBY HEYTENS, Circuit Judge:

Like many before it, this case hinges on whether taking some action on a website is sufficient to agree to an arbitration provision. After being sued by two of its users, an online streaming service moved to compel individualized arbitration. We conclude the users agreed to arbitrate when they registered for the streaming service because they had reasonable notice that registering would constitute assent to the website's terms of use, which included an arbitration clause. We thus reverse the district court's order denying the motion to compel arbitration and remand for further proceedings.

I.

In 2020 and 2021, California residents Rohan Dhruva and Joshua Stern each "created a CuriosityStream.com account and began paying for a subscription to watch videos on the website." JA 22. A few years later, Dhruva and Stern learned CuriosityStream was relaying their "event data" and other "identifiers" to Meta. JA 22–23. Asserting these actions violated the federal Video Privacy Protection Act and California state law, Dhruva and Stern filed a putative class action in Maryland, where CuriosityStream is headquartered.

CuriosityStream moved to compel arbitration. In support of that motion, CuriosityStream provided a declaration from its chief technology officer with images of the website's three-part sign-up process and its terms of use as they existed when Dhruva and Stern subscribed. Although Dhruva and Stern insist they do not remember the website's specific language, the complaint provides dates on which they signed up and they offered no evidence challenging CuriosityStream's representations about how the sign-up

2

pages looked during the relevant times.

The images show that after a user selected a subscription option, provided an email address, and created a password, the user was prompted to complete the sign-up process on the following screen:



JA 49. As shown above, a paragraph preceding the payment information and "Sign up now" button alerted users that "[b]y subscribing to Curiosity Stream, you agree that you've read our Terms of Use," with the words "Terms of Use" written in orange text. *Id.* A user who clicked the words "Terms of Use" "would be immediately directed through the hyperlink to a webpage that present[ed] CuriosityStream's Terms of Use in effect at that

3

time." JA 50.

When Dhruva and Stern signed up, the website's terms of use stated—in all capital letters and on the first page:

> YOUR AFFIRMATIVE ACT OF USING AND/OR REGISTERING WITH THE SITES SIGNIFIES THAT YOU AGREE TO THESE TERMS OF USE. IF YOU DO NOT AGREE, DO NOT USE AND/OR REGISTER WITH THESE SITES.

JA 54, 63. Two paragraphs down, the terms of use advised readers about an "arbitration provision" that "may, except where and to the extent prohibited by law, require you to arbitrate any claims you may have against [CuriosityStream] on an individual basis." JA 54, 63. Further down, there was an arbitration clause under a numbered heading labeled "Dispute Resolution." JA 59, 69.

The district court denied CuriosityStream's motion to compel arbitration. The court first determined that "[t]he layout of the relevant screen on CuriosityStream's website" gave users "adequate notice of the Terms of Use" through its use of an orange hyperlink "on an uncluttered background, close to the payment tabs that the customer ha[d] to fill out and the button that the customer ha[d] to click." JA 129. But the court concluded Dhruva and Stern had not been given "clear notice that by clicking the 'Sign up now' button, they were expressing agreement to CuriosityStream's Terms of Use." *Id.* CuriosityStream moved for reconsideration, which the district court denied. We have jurisdiction to review both orders under 9 U.S.C. § 16(a)(1)(B). See *Daulatzai v. Maryland*, 97 F.4th 166, 178 (4th Cir. 2024) (explaining that the denial of a reconsideration motion "merges with the prior ruling" and is reviewed on appeal as part of "one judgment" (quotation marks

4

removed)). We review orders denying motions to compel arbitration de novo, see *Noohi v. Toll Bros.*, 708 F.3d 599, 602 (4th Cir. 2013), and those denying reconsideration for abuse of discretion, see *Carlson v. Boston Sci. Corp.*, 856 F.3d 320, 325 (4th Cir. 2017).

## II.

We conclude the district court erred in denying CuriosityStream's motion to compel arbitration in the first instance. We thus need not consider whether the district court outpaced its discretion in denying the reconsideration motion.

With some exceptions not implicated here, the Federal Arbitration Act provides that "[a] written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2. A threshold question in every arbitration-related case is thus "whether a valid arbitration agreement exists." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 69 (2019). As the party seeking to compel arbitration, CuriosityStream "bears the burden of establishing the existence of a binding contract to arbitrate." *Marshall v. Georgetown Mem'l Hosp.*, 112 F.4th 211, 218 (4th Cir. 2024) (quotation marks removed).[1]

---

[1] Although the Federal Arbitration Act is a federal law, "[w]hether an agreement to arbitrate was formed is a question of ordinary state contract law principles." *Marshall*, 112 F.4th at 218 (alterations and quotation marks removed). The parties disagree about whether California or Maryland is the controlling State here, but, like the district court, we see no need to resolve that question. The parties flag no relevant differences between California and Maryland contract law that bear on the issues before us. And where, as here, the answer "makes no discernable difference to the relevant analysis," this Court "need not resolve [a] choice-of-law question." *World Fuel Servs. Trading, DMCC v. Hebei Prince Shipping Co.*, 783 F.3d 507, 514 (4th Cir. 2015).

"[T]here is no question that the digital age has changed the nature of contract formation." *Marshall*, 112 F.4th at 218 (quotation marks removed). But "[t]he fundamental principles of contract law continue to apply." *Id.* "[T]he person asserting the contract's existence must demonstrate that the person alleged to be bound by the contract (1) had reasonable notice of an offer to enter into the contract and (2) manifested assent to it." *Naimoli v. Pro-Football, Inc.*, 120 F.4th 380, 389 (4th Cir. 2024) (quotation marks removed). We conclude Dhruva and Stern had reasonable notice of the terms of CuriosityStream's offer and that they objectively manifested their assent to those terms by registering with the website.

### A.

"In the internet context, the traditional notice inquiry focuses on the design and content of the relevant interface and asks whether it would put a reasonably prudent user on notice of a contract on offer and its terms." *Marshall*, 112 F.4th at 218–19 (citation and quotation marks removed). That standard is satisfied here.

### 1.

The payment page reproduced above gave users reasonable notice there was "a contract on offer." *Marshall*, 112 F.4th at 219. That page advised readers that, "[b]y subscribing to Curiosity Stream, you agree that you've read our *Terms of Use* and *Privacy Policy*." JA 49. As the district court observed, the terms of use "hyperlink [was] printed in orange on an uncluttered background, close to the payment tabs that the customer ha[d] to fill out and the button that the customer ha[d] to click" and "[n]othing about the website design or layout obscure[d] the conspicuous location of the Terms of Use hyperlink."

6

JA 129. Although Dhruva and Stern suggest that "other courts have found webpages with nearly identical layouts and even more conspicuous hyperlinks (in standard blue) not sufficiently conspicuous," Appellees Br. 20 n.1, they develop no argument on that point, nor do they assert the district court was wrong to deem the hyperlink here conspicuous. That is precisely the sort of "passing shot" that fails "to raise an issue for our review." *Modern Perfection, LLC v. Bank of Am. N.A.*, 126 F.4th 235, 240 n.1 (4th Cir. 2025) (quotation marks removed).

Dhruva and Stern further assert that even a reader who saw the orange words *Terms of Use* may not have realized that they were agreeing to a contract by clicking the "Sign up now" button or that the hyperlinked terms of use contained provisions that would govern that contractual relationship. We disagree.

We need not—and thus do not—make any broad holding about what a reasonable internet user would understand the words "terms of use" to mean. See *Marshall*, 112 F.4th at 219 n.6 (emphasizing that whether a particular "web-based agreement" creates a binding contract requires "a fact-intensive inquiry" (quotation marks removed)). Instead, we conclude the context of this transaction would have put "a reasonably prudent user" on notice they were forming a contract with CuriosityStream. *Id.* at 219 (quotation marks removed).

In their complaint, Dhruva and Stern acknowledge that they each "created a CuriosityStream.com account and began paying for a subscription to watch videos on the website." JA 22. A subscription is, by definition, a contract. And when a user "sign[s] up for an account," "enter[s] his credit card information," and chooses a subscription plan,

7

that "registration process clearly contemplate[s] some sort of continuing relationship" beyond a one-time exchange of money for a single good or service. *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 80 (2d Cir. 2017). In that context, "a reasonably prudent internet or smartphone user would have been on notice that the hyperlinked terms were connected to finalizing [the] purchase." *Edmundson v. Klarna*, *Inc.*, 85 F.4th 695, 707 (2d Cir. 2023). That is particularly true where—as here—"notice of the Terms of Service is provided simultaneously to" finalizing the transaction because doing so "connect[s] the contractual terms to the services to which they apply." *Domer v. Menard, Inc.*, 116 F.4th 686, 699 (7th Cir. 2024) (quotation marks removed). Thus, a reasonably prudent internet user would have known that the hyperlinked terms of use here applied to the subscription being finalized on the same page.

This Court's recent decision in *Marshall v. Georgetown Memorial Hospital*, 112 F.4th 211 (4th Cir. 2024), helps explain why the notice here was sufficient. Unlike in *Marshall* (where the Court concluded that notice had been insufficient), Dhruva and Stern did not need to "scroll[ ] down" or "go exploring" to find out there were terms of use in the first place. *Id.* at 219–20. Instead, CuriosityStream's website "provide[d] clear and reasonably conspicuous notice that there [were] contract terms available by scrolling down or clicking a hyperlink"—the very situation where courts generally conclude that "the user is on reasonable notice of those terms." *Id.* at 220.

A final consideration clinches the point. The Supreme Court has held, over and over, that the Federal Arbitration Act forbids state-law contract rules that "single[] out arbitration agreements for disfavored treatment"—no matter how modest such rules may seem or how

8

noble their motivations may be. *Kindred Nursing Ctrs. Ltd. P'ship v. Clark*, 581 U.S. 246, 248 (2017). For that reason, Dhruva and Stern concede that their argument is not—and cannot—be limited to the arbitration provisions contained within CuriosityStream's terms of use. See Oral Arg. 33:37–34:15, 37:25–:44. Rather, Dhruva and Stern assert that they are not contractually bound by any of the terms of use, including provisions that (to name just a few) limit CuriosityStream's liability in the event of outages, forbid "introduc[ing] viruses," and acknowledge that the quoted monthly rates do not include "applicable tax." JA 55. But signing up for a monthly subscription service is clearly the sort of "forward-looking relationship" that "require[s] *some* terms and conditions," *Meyer*, 868 F.3d at 80 (emphasis added), and the hyperlinked terms of use here were sufficient to provide reasonable notice of what those terms were.

### 2.

We also conclude that "the design and content of" the website would have "put a reasonably prudent user on notice of" the "terms" of CuriosityStream's contractual offer. *Marshall*, 112 F.4th at 218–19 (quotation marks removed). Dhruva and Stern do not assert that the terms of use failed to provide sufficient notice "that it was offering [them] an arbitration agreement"—a recurring issue that reemerged in *Marshall*, 112 F.4th at 218. Instead, they argue the website's design and wording provided insufficient guidance that completing the subscription process would constitute assent to the proposed contract. Once again, we disagree.

By "subscribing to Curiosity Stream," Dhruva and Stern "agree[d]" they had "read" the hyperlinked terms of use. JA 49. Even if those actions do not preclude Dhruva and

9

Stern from denying they *actually* read those terms, "[c]ourts . . . generally find that when a website provides clear and reasonably conspicuous notice that there are contract terms available by scrolling down or clicking a hyperlink, the user is on reasonable notice of those terms even if she never reads them." *Marshall*, 112 F.4th at 220. We thus conclude that Dhruva and Stern had reasonable notice about what the terms of use said.

A person who read the terms of use would have seen—in all caps and in the second full paragraph on the first page—language identifying actions that would "signif[y] that you agree to these terms of use" and that should be avoided "if you do not agree." JA 54. One of the listed actions was "registering with" "websites, apps, and services operated and controlled by CuriosityStream Inc." *Id.* In other words, the terms of use stated that "registering with" the website would constitute "agree[ment] to" the terms of use.

Dhruva's and Stern's argument seeks to avoid the "registering with" language. Instead, they claim two other textual snippets—one on the payment page and the other in the terms of use—mean they lacked reasonable notice that registering with the website would constitute agreement to the terms of use. We are unpersuaded by both arguments.

Dhruva's and Stern's primary argument rests on the obviously correct proposition that agreeing that you have read something is different from saying you agree with what you have read. But it was not the payment page (where the "you agree that you've read" language was located) that provided notice about how one could manifest assent. It was the terms of use page, which did not say that merely reading its terms would be treated as agreeing to them. JA 49. Rather, the terms of use page referenced two *actions* that would signify assent, one of which was "registering with" a covered website. JA 54; see *Marshall*,

10

112 F.4th at 222 (reiterating the "old contract principle[]" "that assent to a contract may be manifested by conduct"). And because Dhruva and Stern were, at minimum, on notice of the terms of use, they cannot claim ignorance about what actions those terms said would manifest assent.

Dhruva's and Stern's second argument rests on a purported ambiguity about the other action the terms of use said could trigger a binding agreement: "Your affirmative act of *using* . . . the sites signifies that you agree." JA 54 (emphasis added). This language cannot mean what it says, Dhruva and Stern assert, because then "simply going to the CuriosityStream website" would constitute "agree[ment] to the Terms of Use" regardless of whether one created an account and registered with the website. Appellees Br. 18.

This argument also fails. For one thing, some courts have held that affirmative use *can* manifest assent. See *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014) ("[W]here the website contains an explicit textual notice that continued use will act as a manifestation of the user's intent to be bound, courts have been more amenable to enforcing [use-only] agreements." (collecting cases)). But, more importantly, the question before us on a motion to compel arbitration is whether "an arbitration agreement exists between the parties," rather than between CuriosityStream and a hypothetical user who did not register. *Hightower v. GMRI, Inc.*, 272 F.3d 239, 242 (4th Cir. 2001). And because CuriosityStream argues that Dhruva and Stern agreed to arbitrate their claims not only by using the site but also by "registering," we need not decide whether the terms of use provided sufficient notice of how to manifest assent by use alone. See *Marshall*, 112 F.4th at 222 (emphasizing that not "every use of a website—every purchase, download,

11

application, or the like—can reasonably be understood as consent to contractual terms"). Instead, we hold that Dhruva and Stern had sufficient notice that "registering with" the website would manifest assent. JA 54.

## B.

We next conclude that Dhruva and Stern manifested assent to the terms of use (and thus the arbitration clause) by registering with a covered website.

Although the parties spill a great deal of ink debating how a reasonable consumer would understand the words "Sign up now" on the payment page, it is unclear whether any such dispute matters. The terms of use say one consents by "registering," JA 54, and it appears undeniable that Dhruva and Stern registered. Their complaint says they each "created a CuriosityStream.com account and began paying for a subscription," JA 22, which sounds an awful lot like a concession that Dhruva and Stern registered. In addition, the complaint admits that Dhruva and Stern both used CuriosityStream.com to "watch documentary shows" (*id.*)—something that CuriosityStream asserts without challenge *cannot* be done unless a person registers. So regardless of whether it was clicking the "Sign up now" button or some later action that completed the registration process, it appears undisputed that Dhruva and Stern did, in fact, register at some point.

At any rate, we conclude CuriosityStream has the winning argument about what clicking "Sign up now" conveyed. "A user's click of a button can be construed as an unambiguous manifestation of assent only if the user is explicitly advised that the act of clicking will constitute assent to the terms and conditions of an agreement." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 857 (9th Cir. 2022). But that does not mean the

12

button must be labeled "I accept" or "I agree." *Marshall*, 112 F.4th at 222 (quotation marks removed). Rather, "a clear and conspicuous notice that a click . . . will be taken as assent can do the trick." *Id.* Because CuriosityStream expressly advised Dhruva and Stern that "registering with the sites signifies that [they] agree to the[] terms of use," their clicks of the "Sign up now" button objectively and unambiguously manifested assent to those terms. JA 54.

For a final time, Dhruva and Stern ask us to flyspeck language on the payment page while neglecting the words of the terms of use. This time the argument focuses on the language: "*By subscribing to Curiosity Stream*, you agree that you've read our Terms of Use." JA 49 (emphasis added). Dhruva and Stern insist that "the word 'subscribing' is vague and does not necessarily mean clicking a button" and that a reasonable consumer could have believed that some other step of the process constituted "subscribing." Appellees Br. 17–18. But even if that is so (a point we do not decide), the controlling word here is *registering*, not *subscribing*, and Dhruva and Stern fail to explain why it would not have been "clear to the user" that clicking a button labeled "Sign up now" would complete the registration process.[2] *Meyer*, 868 F.3d at 80. We thus hold that Dhruva and Stern manifested assent to the proposed contract terms by clicking the "Sign up now" button. Accord *id.* (holding that a reasonable user would understand that clicking a button labeled

---

[2] A single sentence in Dhruva's and Stern's brief says: "And again, as noted, the words 'subscribing,' *or 'registering,'* are not synonymous with the clicking, which only adds ambiguity to the equation." Appellees Br. 18 (emphasis added). But Dhruva and Stern do not develop this argument any further, and it is not our role to make the parties' arguments for them.

13

"register" would constitute "creating an Uber account" and thus agreement to terms of use (quotation marks removed)).

*    *    *

Dhruva and Stern registered for a service on a CuriosityStream website while having reasonable notice that so registering would constitute agreement to arbitrate any resulting disputes. Because the Federal Arbitration Act requires courts to give effect to that agreement, we reverse the district court's order denying CuriosityStream's motion to compel arbitration and remand for further proceedings consistent with this opinion.

<em>SO ORDERED</em>

WILKINSON, Circuit Judge, dissenting:

The majority notes that while "the digital age has changed the nature of contract formation," "the fundamental principles of contract law continue to apply." Maj. Op. at 6. The formal principles do still apply, but the informal backdrop that imparted greater meaning and authenticity to those principles has changed markedly. Traditional contracting was often informed by the personal relationship between the parties where deals were sealed by a handshake or where mutual trust was nurtured by acquaintance and experience. Rare was the man who extended his hand or signed on the dotted line without knowing he was making a legal commitment. With the internet has come greater impersonality in the process of contract formation. Parties can be contractually bound without any of the formalities that once signaled the onset of legal obligation, parties that for all intents and purposes are strangers in the night.

As contracting has evolved, so too has our caselaw. In *Marshall v. Georgetown Memorial Hospital*, we recognized that the traditional rules cannot be mechanically applied without regard to the "realities of the digital realm." 112 F.4th 211, 220 (4th Cir. 2024). One of those realities, we emphasized, is that "[w]hile a person signing a physical contract 'will rarely be unaware of that fact,' a person using the internet 'may not realize that she is agreeing to a contract at all.'" *Id.* Given that problem, we held that contract formation in the internet context requires "clear and conspicuous" notice of an offer. *Id.*

There was no clear and conspicuous notice here. An offer by definition is a proposal that the offeree is asked to accept. The notice on CuriosityStream's website did not ask

15

Dhruva and Stern to "accept" any proposal. It stated only that "[b]y subscribing to Curiosity Stream, you agree that you've *read* our Terms of Use." J.A. 49 (emphasis added). And without clear and conspicuous notice that a contract was on offer, Dhruva and Stern were not obligated to go search for one. *Marshall*, 112 F.4th at 221.

Notwithstanding the language of the webpage itself, the majority thinks that the surrounding "context" provided clear and conspicuous notice of an offer. In its view, signing up for a subscription service "clearly contemplates some sort of continuing relationship," so "a reasonably prudent internet user would have known that the hyperlinked terms of use here applied to the subscription." Maj. Op. at 8.

This type of judicial guesswork is no substitute for "clear and conspicuous" notice. For one, it is far from obvious that consumers invariably expect "continuing relationships" to come with pages of legal terms. Many continuing relationships unfold informally and rely on implied terms. It is pure speculation to assume that CuriosityStream's customers expected anything different.

And even if consumers expected a formal contract, it is not clear they would have understood that the hyperlinked "Terms of Use" contained one. Internet users are regularly bombarded with pages labeled "Terms of Use," "Terms of Service," "Terms and Conditions," "Privacy Policy," and the like. Sometimes these pages present a contract offer; other times they contain disclosures, legal notices, or mere statements of policy. Even here, for example, CuriosityStream's Terms of Use is filled with noncontractual material like copyright and trademark notices, contact information, and a provision stating the website is "not intended for use by persons under the age of 13." J.A. 54–58.

16

Moreover, the way CuriosityStream presented its Terms of Use made it even less likely that a user would understand it was a contract. Once again, the website asked Dhruva and Stern whether they "read" the Terms of Use, not whether they "agreed" to them. One is normally asked to "read' informational documents and "agree" to contractual ones. Compounding the confusion, the webpage asked users if they "read [the] Terms of Use *and Privacy Policy*." J.A. 49 (emphasis added). A "Privacy Policy" is ordinarily a noncontractual document providing notice of how a company intends to use a customer's data. *See* Thomas B. Norton, *The Non-Contractual Nature of Privacy Policies and a New Critique of the Notice and Choice Privacy Protection Model*, 27 FORDHAM INTELL. PROP. MEDIA & ENT. L.J. 181, 184–85 (2016). By lumping the Terms of Use and Privacy Policy together, CuriosityStream invited reasonable consumers to assume that both documents were merely informational.

Despite all this, the majority seems to think it is self-evident that consumers understand "Terms of Use" to refer to a contract offer. Yet it was not so self-evident to the district court, nor has it been self-evident to the many scholars and other courts who have questioned whether consumers understand "innocuous-sounding" phrases like "Terms of Use" to be equivalent to "Legally Binding Contract." NANCY KIM, WRAP CONTRACTS 186 (2013); *see also Applebaum v. Lyft, Inc.*, 263 F. Supp. 3d 454, 468 (S.D.N.Y. 2017); *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 380 (E.D.N.Y. 2015); *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 475 (2021). That consumers do not uniformly treat "Terms of Use" as synonymous with "binding contract" is demonstrated by the fact that nearly every online business asks consumers to "agree" or "accept" the "Terms of Use," not merely to

17

"read" them. *See, e.g.*, *Emmanuel v. Handy Techs., Inc.*, 992 F.3d 1, 3 (1st Cir. 2021); *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 71 (2d Cir. 2017); *Naimoli v. Pro-Football, Inc.*, 120 F.4th 380, 384 (4th Cir. 2024); *Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1011 (9th Cir. 2024).

By inferring assent under the fuzziest of circumstances here, the majority effectively abandons *Marshall*'s "clear and conspicuous" notice rule in favor of a murky totality of the circumstances test. This choice has several troubling consequences.

First, the majority's decision will be a spur to litigation. If "read the Terms of Use" is sufficient, what about "aware of the Terms of Use?" Or "acknowledge the Terms of Use?" What if the terms are hyperlinked next to the sign-up button with no verb at all? Courts will now be forced to parse through every turn of phrase to determine whether it comes close enough to "agree." This decision invites litigiousness and leaves courts thrashing over a threshold issue, with the merits of the dispute still on the far horizon.

Second, the majority's approach wrongly places the burden of avoiding confusion on consumers instead of on the companies that are best positioned to prevent it. It would be easy for a sophisticated corporate party like CuriosityStream to simply ask its customers if they "agree to the Terms of Use." It is much harder for millions of unsophisticated consumers to sift through ambiguous phrases and dense legalese to discern whether they are agreeing to a contract. Fixing this problem should have been simple, but the majority opts for a needlessly complex and costly route. *Cf. Holtz v. J.J.B. Hilliard W.L. Lyons, Inc.*, 185 F.3d 732, 743 (7th Cir. 1999) (explaining that liability should rest on "least-cost avoider"); *Maersk Line, Ltd. v. United States*, 513 F.3d 418, 423 (4th Cir. 2008) ("The

basic contract law principle *contra proferentem* counsels that we construe any ambiguities in the contract against its draftsman.").

The majority is surely right that the Federal Arbitration Act underscores the importance of arbitration as an alternative means of dispute resolution with the promise of lessened expense and greater expedition. Courts especially should welcome arbitration as a means of reducing the burdens and delays that can result from full-blown litigation. But as the Supreme Court has repeatedly emphasized, arbitration must be "a matter of consent," not ambush. *Coinbase, Inc. v. Suski*, 602 U.S. 143, 148 (2024). Yet under the majority's approach arbitration becomes less a choice and more a trap.

Notwithstanding the fact that CuriosityStream bears the burden of demonstrating an enforceable arbitration clause, carrying that burden need not be hard. Stating up front the presence of the arbitration clause as a term of the agreement would seem to be unimpeachable. Boldface would help. Simply making clear at the very outset that "by subscribing to Curiosity Stream, you agree to our Terms of Use" would be much better than what we have here.

Is that so very hard? As desirable as arbitration unquestionably is, it should be accompanied by basic honesty and candor with regard to consumers. Relying on a multi-step process dependent on some combination of links, scrolls, and semi-scrutable language is only going to bring more companies into litigation, the very thing that they hoped, understandably, that arbitration would avoid.

19

I am sympathetic to the result reached by my friends in the majority, but I do not agree with the means that CuriosityStream chose to get there. Means matter in the law and they were lacking here.

I respectfully dissent.